## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 17 2018, 7:39 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mercy Darrington,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | May 17, 2018<br><br>Court of Appeals Case No.<br>49A02-1708-CR-1876<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marc T. Rothenberg, Judge<br><br>Trial Court Cause No.<br>49G02-1310-FB-69153 |

**Brown, Judge.**

[1] Mercy Darrington appeals her sentence for two counts of neglect of a dependent resulting in serious bodily injury as class B felonies. Darrington raises three issues which we consolidate and restate as:

I.   Whether the trial court erred in ordering her to pay certain fines and costs; and

II.  Whether her sentence is inappropriate in light of the nature of the offense and her character.

We affirm and remand.

## Facts and Procedural History

[2] On July 12, 2013, Da., born on December 4, 2010, and De., born on July 12, 2012, (Da. and De., together, the "children") and their two older siblings were placed in foster care with Darrington, a therapeutic foster parent. In August 2013, Kylee Bunnell, an employee of The Villages of Indiana, a primary foster care and adoption agency, picked up De. and Da. from their foster home for a visit with their biological mother. During the visit, the children's biological mother brought sausages and a lemonade or juice for the children. Once the food and drinks were brought, Da. did not want to go back and play and was "just pouring more juice and wanting juice and juice." Transcript Volume II at 23. Da. was "just sitting at the table wanting to drink." *Id.* Bunnell tried to redirect Da. to water instead of juice and Da. was "downing those just left and right, cold water, like he had done with the juice. But just kept wanting more and more, stopping to take a breath and just kept chugging." *Id.* at 24.

In October 2013, another visit occurred at The Villages. Casey Elliott, an employee at The Villages and a provider of supervised parenting time, provided transportation for Da. and De. and went to Darrington's home to pick the children up for a visit with their biological mother. Da. was crying when Elliott arrived and continued to do so. Darrington brought Da. out, and Elliott observed that he was crying uncontrollably and shaking. Darrington told Elliott that Da. had been crying for awhile and that "it was probably excitement about the visit." *Id.* at 55. Elliott did not see Darrington comfort Da. and observed that De. "showed no emotion at all" and was just sitting. Elliott took Da. and De. to The Villages for a visit and noticed that Da. was "walking strange," "like shuffling his feet," and that he "tripped over his feet a couple of times." *Id.* at 57. She observed that one side of Da.'s face "appeared to kind of be drooping significantly more than the other side." *Id.* She also observed changes in De. and Da. from earlier visits in that they were not active or playing, they stopped smiling and laughing, and "[t]hey would just pretty much sit on the couch just expressionless, emotionless." *Id.* at 60.

When the children's biological mother arrived for the visit with fried chicken and juice, Da. "beelined for the food" and "went straight for the juice again." *Id.* at 27. Da. was "chugging, vomited, and kept drinking." *Id.* Da. "just needed to eat and drink." *Id.* at 28. At that time, Bunnell was extremely worried. Elliott observed Da. "drink cup after cup of either juice or water as fast as he could." *Id.* at 59. Da. drank continuously through the whole visit, became sick a couple of times and threw up, and wanted to drink again. At

some point, Bunnell observed that Da.'s eye was droopy and he did not change facial expressions. The Clinical Director at the Villages observed the children and then called Child Protective Services.

[5] Indianapolis Metropolitan Police Detective Sergeant Eli McAllister arrived at the scene and observed that De. was "more or less asleep or non-responsive." *Id.* at 130. He also observed that Da. was awake but appeared very afraid, uneasy, was shaking, and his left eyebrow was drooping down. An ambulance was called, the medics informed Detective Sergeant McAllister and others that they felt that the children needed to be transported to Riley Hospital for Children right away and then transported them to the hospital where an emergency room physician decided to admit the children.

[6] That evening, Detective Sergeant McAllister interviewed Darrington. She stated that De. was "very, very, overweight" when she was placed in her home. State's Exhibit 11 at 24:10-24:15. She told him at one point that she did not give De. anything to drink at lunch on Monday. She stated that she was easing up on the milk because she was looking for a bowel movement from De., that she gave De. half a cup of milk at 2:30 on Monday, and that she did not give De. or Da. anything to drink in between meals. She later indicated that on that Monday, De. had half of a sippy cup of milk for breakfast, a little less than half a cup at 12:00, and had nothing else to drink that day. She stated that Da. did not eat much recently. When asked why she did not allow the children to have anything to drink outside of mealtimes, she answered that they wet the bed and pee on themselves. Detective Sergeant McAllister found the information

Darrington gave him about what she had been feeding the children and providing them to drink to be "wholly inadequate and strangely restrictive," and arrested her. Transcript Volume II at 139.

[7] The next day, Dr. Tara Harris, an assistant professor of clinical pediatrics at Riley Hospital for Children with a subspecialty in child abuse pediatrics, observed that De. could not be engaged at all, and "[i]f you moved forward to engage with her or if she thought you were going to touch her, she screamed." *Id.* at 85. Dr. Harris also observed that De.'s skin looked very dry to the point that it was wrinkled which was not typical for a fifteen-month-old. She determined that the cause of the appearance of De.'s skin was from profound dehydration and that her sodium level was 164 which was outside the normal range of 135 to 145 and potentially lethal for her and her potassium level was critical.

[8] Dr. Harris observed that Da.'s behavior was very unusual for a child his age and that he was very quiet. She also observed that he had very dry skin to the point of having some saggy and "kind of wrinkled-looking" areas. *Id.* at 97. She determined that Da.'s sodium level was 155 which, "[i]f it progressed much further, it certainly could be life threatening." *Id.* at 97. She also determined that Da.'s potassium level was at a level where it could have been life threatening. Da. received treatment and his sodium levels returned to the normal range after two days. With treatment, De.'s levels returned to normal by the third day.

[9] On October 23, 2013, the State charged Darrington with two counts of neglect of a dependent as class B felonies and two counts of battery as class D felonies. On July 15, 2016, the State charged Darrington in an amended information with two counts of neglect of a dependent resulting in serious bodily injury as class B felonies and one count of battery resulting in bodily injury as a class D felony.

[10] On June 26 and 27, 2017, the court held a jury trial. When asked about Da.'s drinking and wanting more to drink, Bunnell testified: "At first the juice wasn't but after we noticed, like, how much he kept, like, just not wanting to do anything else, it became – it started to become very unusual." *Id.* at 24. Elliott testified that Da. was not a "real active child" and that "[a]ny time there was food or drink, he would eat or drink as – all of it – as much of it as he could as fast as he could" at "[e]very visit." *Id.* at 57. Dr. Harris testified that the high levels of sodium in De. and Da. were due to fluid restriction and that a fifteen-month-old should have four full eight-ounce sippy cups each day. Dr. Harris also testified that the level of dehydration did not develop rapidly. She testified that Da.'s droopy eyebrow was related to his sodium level which can change the way one's nerves are working. When asked if there was any way to know what the full implications would be for De. and Da., Dr. Harris answered:

> Unfortunately, no. What they experienced is something we term medically as Toxic Stress. So, again, for both of them, they're at that period of those early, formative years where their brain is growing really rapidly and should be making lots of new connections. The way that you make all those new connections is by good nutrition and by interacting with the world. So by

people talking to you and playing with you and having those interactions. So the fact that they didn't have those and didn't have that adequate nutrition for brain growth is going to have life-long implications for them.

*Id.* at 108. She also testified that, if De. and Da. had not been treated, they would have died from the liquid restrictions. The court admitted photographic evidence showing the appearance of the children when they were hospitalized.

[11] After the State rested, Darrington moved for a directed verdict, and the court denied the motion. During the presentation of the defense's case, Dr. Dana Hiller testified that she had seen De. and Da. on one occasion in late summer or early fall when Darrington brought them in for a wellness check, the children seemed to be doing fairly well, and she did not have any specific concerns but referred the children to First Steps because they had mental or physical developmental disabilities. On cross-examination, Dr. Hiller testified that she never saw them again after that visit in September.

[12] Terri Everitt, an employee of Dockside Services, an agency contracted with the Department of Child Services to provide services including therapy and case management, testified that she was a foster care case manager in 2013 and that the children were initially very scared and would scream when out of Darrington's presence. She testified that she visited Darrington's home twice a week on a regular basis, visited the home on October 22, 2013, noticed only that Da. and De. were fussy and wanted to be in the same room with her, and did not notice a droopiness on Da.'s face.

[13] Tyanne Clancy, a social worker, testified that she went to Darrington's home between 4:30 and 5:00 on October 22, 2013, to pick up her own two children who Darrington cared for while she worked and did not notice anything out of the ordinary with Da. or De.

[14] The jury found Darrington guilty of two counts of neglect of a dependent resulting in serious bodily injury as class B felonies and not guilty of battery.

[15] On July 26, 2017, the court held a sentencing hearing. Detective Sergeant McAllister testified there were six children living in Darrington's home, he did not see many toys, and there was food in the kitchen. He testified that he interviewed the two older foster children that were related to De. and Da. and both described in particular one occasion in which Darrington slapped Da. across the face. He also testified that one of the children talked about watching Darrington telling De. to shut up on the morning of the investigation and "push her head into the pack 'n play and then even when she started crying louder, she shoved her head harder." Transcript Volume III at 66. He also testified that there were numerous electronics in the home, specifically televisions, as well as a Cadillac sedan, a Cadillac SUV, and a Corvette convertible.

[16] Darrington stated:

> Definitely I'd like to say that I'm sorry. You know, for one, it was never the intention to harm any child. And so, you know, for that, I apologize. I have learned, you know, the dehydration and more on the facts of nutrition. You know, I did not withhold anything. They were drinking milk. They were drinking milk

and juice and just not enough water. I didn't withhold with any intent of harming any child.

And, again, I've learned. I continue repeatedly to share the information with others to say, Give your kids more water. Give your kids more water. They need water, not just juice and not just milk. We have to, you know, some of us just didn't know. I do know now. And that mistake will never happen again. You know, that I'm confident of.

*Id.* at 80. She also testified that she purchased bicycles and clothes for the children, the testimony that she struck one of the children was not accurate, and that she filed for bankruptcy in 2016 and the bankruptcy was complete. The court asked her if she had equity in her mortgage, and she answered: "No. The home is upside down." *Id.* at 85.

[17] The court stated:

[T]his case is not the typical case you see here. When you see Neglect of a Dependent, I usually see, unfortunately, a dead child, one who has usually been beaten, shaken, smothered. I don't see one who's been now malnourished. It was unusual in that sense.

I don't think it's a situation where Ms. Darrington didn't care. I don't think that's it at all. I think there was certainly a level of ignorance and a level of – for lack of a better term, a draconian sense of upbringing which brought us here. I think she did what she thought was best. Unfortunately, it was terrible.

If you think, you know, every time someone wets themselves the punishment is you don't give them something to drink, that's a terrible, terrible thing. Withholding the – you know, she can buy them all the TVs in the world. She can buy them clothes. She

can buy them everything. But you're withholding the essentials of life. You're withholding water. You know, you can survive without food. You can't – for a bit. You can't survive without water for more than two days. Other liquids may substitute that hydration for a short period of time, but in the end, you need water.

So it's not that I think she doesn't care. I think that she intentionally – I think there was absolutely a knowing aspect to this. She knew what she was doing. I just think her methods were criminal. They rose to the level and the jury agreed with me.

*Id.* at 92-93. The court stated: "There are aggravators in this matter. The nature of the crime, I think, again, the malnutrition. It's not something I see but it's something that has to be considered as an aggravator." *Id.* at 94. The court found the "young age of the dependent" as an aggravator. *Id.* The court found the fact that "the crime is going to be the result of circumstances that are unlikely to occur as a mitigator because she shouldn't have care and control of any children." *Id.* at 95. The court also observed that Darrington did not have a criminal history. The court stated: "I think she has expressed remorse but I'm not sure she's really accepted responsibility." *Id.* The court sentenced Darrington to ten years with seven years suspended for each count and ordered that the sentences be served consecutive to each other.

[18] The court imposed a fine of $4,000 for each count for a total of $8,000. At the sentencing hearing, the court stated:

Now, I understand there was a bankruptcy proceeding. Without that bankruptcy proceeding, I – and based on what I've seen and the assets I've seen and when they were purchased, I believe she

has the means to pay these fines and the court costs I'm going to assess on her $183.00 on each cause, probation fees in the amount of $100.00 on each cause which is the amount I can give plus any administrative fees.

That being said, if the Defense wants to present the bankruptcy findings and proof of assets, I would look to modify that fee if they can show that she really truly has liquidated assets and she has no way of paying. Otherwise, yeah. She can sell a TV. She can sell a car. I know she's upside down on her house, but she can get herself a reverse mortgage. I mean, there are ways of doing that unless that bankruptcy tells me, which she just recently went through – and it very well may – that she has no assets.

*Id.* at 97.

[19] Darrington indicated that she wished to appeal, and her counsel asked the court to appoint pauper counsel. The court stated:

Okay. Aside from – and granted. Considering the fines that I've imposed and the assets that I see here, she has no income. I will appoint pauper counsel for those purposes. But, again, make no mistake. I do find that from the evidence presented, she does have the assets to pay the fines that have been assessed in this matter.

*Id.* at 98-99.

## *Discussion*

### I.

[20] The first issue is whether the trial court erred in ordering Darrington to pay certain fines and costs. Sentencing decisions, including decisions to impose

restitution and costs, are generally left to the trial court's discretion. *Berry v. State*, 950 N.E.2d 798, 799 (Ind. Ct. App. 2011). If the fees imposed by the trial court fall within the parameters provided by statute, we will not find an abuse of discretion. *Id.*

[21] Darrington acknowledges that certain vehicles were jointly owned by herself and her adult daughter and that they had been purchased in 2011, 2010, and 2009. She points to her testimony that "[t]his whole case has depleted all my finances and living situation which is what's indicated with the bankruptcy or where that stemmed from." Transcript Volume III at 83. She also points out that she was upside down on her home. She asserts that the trial court did not dispatch its affirmative duty to determine whether she was indigent before it imposed the fine and that this court should remand for a proper indigency hearing.

[22] The State argues that it presented evidence of Darrington's material assets including her luxury vehicles, flat screen televisions, hot tub in her bedroom, and newly remodeled kitchen. The State also asserts that Darrington made a total of $12,796.92 for being a foster parent to Da. and De. between July 12, 2013, and October 22, 2013, prior to their removal. It asserts that the indigency hearing was part and parcel of the sentencing hearing.

[23] Ind. Code § 35-50-2-5 provides that a person who commits a class B felony "may be fined not more than ten thousand dollars ($10,000)." The Indiana Supreme Court has noted that the Indiana legislature requires indigency

hearings as to the imposition of fines and costs, *see* Ind. Code § 33-37-2-3(a) (providing "when the court imposes costs, it shall conduct a hearing to determine whether the convicted person is indigent"); Ind. Code § 35-38-1-18 (same for court-imposed fines), and the Court has held that, "when fines or costs are imposed upon an indigent defendant, such a person may not be imprisoned for failure to pay the fines or costs."[1] *Whedon v. State*, 765 N.E.2d 1276, 1279 (Ind. 2002). The Court has also stated that "a defendant's financial resources are more appropriately determined not at the time of initial sentencing but at the conclusion of incarceration, thus allowing consideration of whether the defendant may have accumulated assets through inheritance or otherwise." *Id.* While a trial court's appointment of defense and appellate counsel for a defendant implies a finding of indigency, the appointment of counsel is not conclusive as to the defendant's inability to pay costs. *Briscoe v. State*, 783 N.E.2d 790, 792 (Ind. Ct. App. 2003). Where a trial court fails to conduct an indigency hearing when required, the proper remedy is to remand with instructions to hold such a hearing. *Id.* at 792-793.

[24] Although there was testimony regarding the vehicles Darrington owned and the televisions in her home, the record also revealed that Darrington testified that she had filed bankruptcy which was complete and that she was upside down on

---

[1] Also, Ind. Code § 33-37-2-3(b) provides in part that "[a] court may impose costs and suspend payment of all or part of the costs until the convicted person has completed all or part of the sentence" and "[i]f the court suspends payment of the costs, the court shall conduct a hearing at the time the costs are due to determine whether the convicted person is indigent."

her mortgage. Under "Financial Situation," the presentence investigation report ("PSI") states:

> [Darrington] stated that she is currently supporting herself through her savings due to having been laid off in 2008 from her last place of employment. The defendant also listed that she receives $200 per month for child support and also reported receiving $1200 per month from her family. The defendant admitted that she does have a checking account but indicated that she did not have either a savings account or any assets of value. The defendant reported that her monthly bills total $1516.00 and indicated that she does not have any past due debts but also indicated that she filed bankruptcy in 2016. The defendant indicated that she felt that she was not able to pay her bills but also indicated that she was able to pay her bills without struggling.

Appellant's Appendix Volume III at 100. The court acknowledged that "it very well may – that she has no assets." Transcript Volume III at 97. In appointing pauper counsel for appeal, the court stated that Darrington "has no income." *Id.* at 98. Under the circumstances, we conclude that the trial court erred in failing to hold a hearing or make the necessary inquiry regarding Darrington's indigency or ability to pay as statutorily required. We remand with instructions to hold a hearing on Darrington's indigency or ability to pay. *See Briscoe*, 783 N.E.2d at 793 (noting that the appointment of trial and appellate counsel implied the trial court knew of the defendant's indigency and that the presentence investigation report provided some information regarding the defendant's financial position, noting that these facts were not conclusive as to the defendant's ability to pay fees, holding the trial court erred when it failed to

conduct a hearing on this issue, and remanding with instructions to hold a hearing on the defendant's indigency because his sentence included the imposition of a fee).

## II.

[25] The next issue is whether Darrington's sentence is inappropriate in light of the nature of the offense and the character of the offender. Darrington asserts that she felt bad about what happened, did not contemplate that the amount of fluid she gave the children would harm them, and did much good for them including taking the children to wellness checks. She also points out that many professional people credentialed in child care did not discern anything out of the ordinary with the children. She asserts that she has a good relationship with her family, worked for twenty-five years as an underwriter but had not been employed since she was laid off from that job in 2008, and has no criminal history or history of drug use. She requests that we revise her sentence to a lesser time on home detention and probation and run the sentences concurrently.

[26] The State points out that the trial court suspended most of Darrington's sentence to probation and that nothing about the nature of the offenses warrants a downward revision of Darrington's already lenient sentence. The State asserts that Darrington's treatment of the children reflects poorly on her character.

[27] Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[28] Ind. Code § 35-50-2-5 provides that "[a] person who commits a Class B felony (for a crime committed before July 1, 2014) shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years."

[29] Our review of the nature of the offense reveals that Darrington was the therapeutic foster parent for Da. and De. While in Darrington's care, the children suffered profound dehydration and high levels of sodium and potassium due to fluid restriction. Dr. Harris determined that De.'s sodium level was potentially lethal for her and that Da.'s potassium level was at a level where it could have been life threatening.

[30] Our review of the character of the offender reveals that Darrington does not have a criminal history. Darrington reported she worked as an insurance underwriter for twenty-five years until she was laid off in 2008 and had not been employed since 2008. The PSI indicates that Darrington reported never consuming alcohol, marijuana, cocaine, heroin, methamphetamine, or prescription pills. The PSI also indicates that Darrington's overall risk

assessment score using the Indiana risk assessment system places her in the low risk to reoffend category.

[31] After due consideration, we conclude that Darrington has not sustained her burden of establishing that her consecutive sentences of the advisory sentence of ten years with seven years suspended for each count is inappropriate in light of the nature of the offense and her character.[2]

### *Conclusion*

[32] For the foregoing reasons, we affirm Darrington's sentence and remand for a determination of her indigency or ability to pay consistent with this opinion.

[33] Affirmed and remanded.

Bailey, J., and Crone, J., concur.

---

[2] To the extent Darrington argues the court abused its discretion in sentencing her by using the malnutrition the children experienced as an aggravator, we need not address this issue because we find that her sentence is not inappropriate under Ind. Appellate Rule 7(B). *See Chappell v. State*, 966 N.E.2d 124, 134 n.10 (Ind. Ct. App. 2012) (noting that any error in failing to consider the defendant's guilty plea as a mitigating factor is harmless if the sentence is not inappropriate) (citing *Windhorst v. State*, 868 N.E.2d 504, 507 (Ind. 2007) (holding that, in the absence of a proper sentencing order, Indiana appellate courts may either remand for resentencing or exercise their authority to review the sentence pursuant to Ind. Appellate Rule 7(B)), *reh'g denied*; *Mendoza v. State*, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007) (noting that, even if the trial court is found to have abused its discretion in sentencing, the error is harmless if the sentence imposed is not inappropriate), *trans. denied*), *trans. denied*.